**AMERICAN CASUALTY CO. OF READING, PA., v. MORRIS et al.**

**Civil Action No. 19–F.**

District Court, N. D. West Virginia.

Sept. 30, 1943.

Oscar J. Andre, of Clarksburg, W. Va. (Steptoe & Johnson and James M. Guiher, all of Clarksburg, W. Va., on the brief), for plaintiff.

Ernest R. Bell, of Fairmont, W. Va., for defendant David G. Morris.

Marion Meredith, of Fairmont, W. Va., for defendants Fred Motter and John Simon, administrator of Gerald Simon's estate.

HARRY E. WATKINS, District Judge.

This is a declaratory judgment action in which the American Casualty Company of Reading, Pennsylvania, has moved for summary judgment. Decision of the case turns upon the interpretation of a policy of casualty insurance issued by plaintiff to defendant, David G. Morris. More specifically, the issue is whether the negligent operation of the truck by an employe of Morris, resulting in the death of one

passenger and injury to another is within the coverage afforded by the policy.

Two actions have been instituted in the West Virginia court against Morris to recover damages for death and injury to these passengers. In order to settle the controversy over the interpretation of the policy, the casualty company brought this suit in the district court for a judgment declaring that the policy did not cover the liability, if any, of Morris, in the circumstances stated, and that it was not obligated nor liable in any way to defend the suits in the state court, nor to pay any judgment that might be rendered in them.

Plaintiff based its motion for summary judgment upon the following undisputed facts: It had issued an automobile liability indemnity policy to David G. Morris on a truck owned and used by him as a common carrier in the transportation of coal, stone and other such commodities for hire, and as a contract carrier of brick for Hammond Fire Brick Company. About October 3, 1942, Morris and Motter left their homes at Fairmont, W. Va., to go on a camping and fishing trip to a place near Glenville, W. Va., a distance of about 85 miles. They traveled in an automobile owned by Morris. The trip was solely for pleasure and in no way connected with the business conducted by Morris. After traveling about 45 miles the automobile became disabled, but the two managed to get a ride to their camping destination. Morris sent a message to one Anderson, his employe, requesting him to bring the truck in question in the evening of October 6, after Anderson had finished his day's work, to the place where they were camping for the purpose of taking them back home and of towing the disabled automobile back to Fairmont. Pursuant to this request, on the evening specified, after completing his day's work, Anderson drove the truck in question from Fairmont to the place where Morris and Motter were camping, passing the place where the disabled automobile was located. No goods or merchandise were transported in the truck on this occasion. Without the knowledge of Morris, Anderson took two young men, Wilborn Farmer and Gerald Martin Simon, with him as company on the trip. Farmer and Simon made the trip solely for their own pleasure as guests of Anderson. About 9:30 o'clock that same evening Morris, Motter, Anderson, Farmer and Simon left the camp and started back to Fairmont, all of them riding in the truck, with Morris driving. After traveling about three or four miles, and before reaching the place where the disabled automobile was located, the truck skidded off the road while rounding a curve. The truck went over a steep bank, resulting in the death of Simon and injuries to Motter. No other vehicle was in any way involved in the accident.

Chapter 24A of the West Virginia Code places the supervision and regulation of motor carriers in the Public Service Commission. Paragraph (g), Article 5, Section 5 of that chapter gives the commission power to require motor carriers to file with the commission a surety bond or policy of insurance, or other security— "* * * for the reasonable protection of the traveling, shipping, and general public against injury, loss, damage, or default for which such carrier may be liable, and prescribed rules and regulations governing the filing of evidence of such insurance and such security with the commission. In fixing the amount of such insurance policy or policies, * * * the commission shall give due consideration to the character and amount of traffic, the value of the property transported, the number of persons affected, and the degree of danger involved in any such motor carrier operation."

By virtue of such authority the commission has prescribed certain rules and regulations concerning the issuance of permits to motor carriers. Rule 1 requires the motor carrier to file with the commission a policy of insurance or surety bond or other security conditioned to pay " * * * any final judgment recovered against *such motor carrier* for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, ownership, or use of motor vehicles *under such certificate or permit*, or for loss or damage to property of others; * * *".

In order to meet these requirements and to qualify him as a carrier, Morris applied for and received the policy in question. One of the endorsements on the policy designated as "Exclusion of Passenger Hazard", is as follows: "In consideration of the premium at which this policy is written, it is agreed that such insurance as is afforded by the policy for Bodily Injury Liability and for Property Damage Liability does not apply to bodily injury, including death at any time resulting there-

from, or damage to property sustained by any person while in or upon, entering or alighting from the automobile."

The premium actually charged by the plaintiff for that portion of the policy involved in this case, covering bodily injury liability, was $20.80. Had this exclusion of passenger hazard endorsement not been attached to the policy, the premium covering bodily injury liability which would have been charged by plaintiff would have been $35.25. It is this endorsement which forms the basis of plaintiff's denial of liability. The injured persons were both passengers, riding on the truck, and, unless there is some other provision superseding this endorsement, the policy would clearly furnish no coverage for these particular injuries.

Defendants contend that another endorsement attached to the policy (M. C. Form 13) provides such coverage. This endorsement is one which the Public Service Commission requires to be attached to all policies of insurance issued upon motor carriers used in the business of motor carriers. The pertinent part of this endorsement is as follows:

"The policy to which this endorsement is attached is an automobile bodily injury liability and property damage liability policy and is hereby amended to assure compliance by the Insured, as a motor carrier of passengers or property, with the pertinent rules and regulations of the Public Service Commission of West Virginia, promulgated in accordance with the provisions of Paragraph (g), Section 5, Article 5 of the Motor Carrier Law."

"In consideration of the premium stated in the policy to which this endorsement is attached, the company hereby agrees to pay any final judgment recovered against the Insured for bodily injury to or the death of any person * * * * *, resulting from the negligent operation, maintenance, ownership, or use of motor vehicles *under certificate of convenience and necessity or permit issued to the Insured by the Public Service Commission of West Virginia,* or otherwise *under the Motor Carrier Law,* * * *. The liability of the company extends to *such* losses, damages, injuries or deaths whether occurring on the route or in the territory authorized to be served by the Insured or elsewhere, except as follows: No exceptions."

"Nothing contained in the policy or any other endorsement thereon, nor the violation of any of the provisions of the policy or of any endorsement thereon by the Insured, shall relieve the company from liability *hereunder* or from the payment of any *such* final judgment."

"The Insured agrees to reimburse the company for any payment made by the company on account of any accident, claim or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement."

Uncontroverted facts make it clear that at the time of the accident the truck was not being used for a purpose which required a motor carrier permit from the Public Service Commission. It was not being used to transport either persons or property for hire. While it was licensed and permitted to do so, at the time of the accident it was not actually being operated or used "under certificate of convenience and necessity or permit issued to the Insured by the Public Service Commission of West Virginia, or otherwise under the Motor Carrier Law", as provided in M. C. Form 13 endorsement. Defendants take the position that this endorsement is applicable, and supersedes all other provisions in the policy, without regard to whether the truck was being used in its business and under its permit as a motor carrier at the time of the accident. It may be that this endorsement would supersede all other provisions and endorsements in the policy, including the "Exclusion of Passenger Hazard" endorsement, for accidents occurring while the truck was in actual use as a motor carrier under its permit, or the Motor Carrier Law. Had the truck been transporting property for hire, or tranporting brick as a contract carrier under its motor carrier permit, at the time of the accident in question, it may be that endorsement M. C. Form 13 would be applicable and would nullify the effect of the "Exclusion of Passenger Hazard" endorsement. This question is raised but not answered in Hawkeye Casualty Co. v. Halferty, 8 Cir., 131 F.2d 294, 299; Id., 63 S.Ct. 533, 87 L.Ed. ——. But here plaintiff says that the truck was not being used for a purpose requiring a permit from the Public Service Commission as contemplated by the statute; that, consequently,

the endorsement "M. C. Form 13" does not apply; that the contract of the parties controls; and by virtue of the exclusion of passenger hazard provision there is no coverage and no obligation on the part of plaintiff to defend Morris in any action arising out of the accident or to pay any judgment rendered against him in such accident. I am of the opinion that this construction of the contract by plaintiff is correct.

█ There is no statute in West Virginia which requires compulsory insurance upon motor vehicles used for private purposes. The statute cited applies only to motor vehicles being operated as "motor carriers" and while being used as such. The intent of the Legislature is shown in the first paragraph of the statute in which the purposes of the statute are stated " * * * to: (a) protect the safety and welfare of the traveling and shipping public in their use of transportation agencies by motor vehicle; (b) preserve, foster, and regulate transportation and permit the coordination of transportation facilities; (c) provide the traveling and shipping public transportation agencies rendering stabilized service at just and reasonable rates." The statute authorizes the commission to require insurance " * * * for the reasonable protection of the traveling, shipping, and general public against injury, loss, damage, or default for which *such carrier* may be liable." In fixing the amount of insurance to be carried, the commission shall give due consideration " * * * to the character and amount of traffic, the value of the property transported, the number of persons affected, and the degree of danger involved in any *such motor carrier operation*". Ch. 24A, Art. 2, Section 2 provides: "No common carrier by motor vehicle shall operate any motor facility for transportation of either persons or property *for hire* on any public highway in this state except in accordance with the provisions of this chapter * * *". This indicates an intent to exclude from the provisions of the statute any motor vehicle when not transporting either persons or property for hire. The same intent is even more definitely shown in Rule I promulgated by the commission pursuant to such statutes, wherein it requires an insurance policy or other security "conditioned to pay * * * any final judgment recovered against such motor carrier for bodily injuries * * * re-

sulting from the negligent operation, maintenance, ownership, or use of motor vehicles *under such certificate or permit*". The endorsement relied upon by defendants, M. C. Form 13, required by the commission, contains the same pertinent language. Repeated use of the words "motor carrier", "such carrier", "for hire", "such motor carrier operation", "motor carrier of passengers and property", and "under such certificate or permit" indicates the intent of the Legislature and the commission to apply them to motor carrier operations only.

█ Defendants rely upon the third paragraph in the endorsement M. C. Form 13, to the effect that "Nothing contained in the policy or any other endorsement thereon, nor the violation of any of the provisions of the policy or of any endorsement thereon by the Insured, shall relieve the company from liability *hereunder* or from the payment of any *such final judgment.*" They interpret this to mean that nothing in the policy or any endorsement shall relieve the company from any liability imposed by law upon Morris as a result of accidents occurring in the operation or use of his truck, whether such truck was engaged in his business as a common carrier or otherwise. Such a construction completely ignores the word "hereunder", as well as the purpose of the Motor Carrier Law. The prohibition of the endorsement is that no provision in the policy or any other endorsement shall relieve the company from liability hereunder—that is, liability "resulting from the negligent operation, maintenance, ownership, or use of motor vehicles under certificate of convenience and necessity or permit issued to the Insured by the Public Service Commission of West Virginia, or otherwise under the Motor Carrier Law", as fully set out in the next preceding paragraph of the endorsement. The effect of the language used was to invalidate any attempt on the part of the casualty company to limit by contract its liability resulting from operation of the truck in the owner's business as a common carrier. The language used did not operate to extend the liability imposed upon the insurer by the preceding paragraph of the endorsement, but to prevent limitation of that liability. Travelers Insurance Company v. Caldwell, 8 Cir., 133 F.2d 649, 655; Foster v. Commercial Standard Ins. Co., 10 Cir., 121 F.2d 117. See also 7 Appleman, Insurance Law and

Practice (1942) Section 4470, wherein this recent publication states the applicable rule as follows: "The standard commission endorsement to the effect that nothing contained in the policy or any endorsement thereto should relieve the insurer of liability thereunder does not operate to change the terms of the contract prescribed by statute so as to cover a truck when not engaged in operations of the carrier. It is no purpose of the act to require insurance for use other than for the purpose for which the protection under the act was designed." It was not the purpose of the Legislature or the commission to interfere with the operation of motor vehicles when not in fact transporting persons or property for hire. Caines v. Wheeler, 207 Ky. 237, 268 S.W. 1098; Motor Car Indemnity Exchange v. Lilienthal, Tex.Civ.App., 229 S. W. 703. The words used in the endorsement must be interpreted in the light of the power and authority of the Public Service Commission. When so interpreted they cannot control other provisions of the policy in no wise connected with assured's business as a common carrier.

■■ Since the truck was being used for a purpose which did not require a permit, it was not being operated under such a permit or the Motor Carrier Law, and M. C. Form 13 does not apply. The effect of this is to leave the parties in the same position they would be had the truck never been used as a motor carrier. As such they had the right to, and did, enter into their own private contract of insurance. In the contract agreed upon was the endorsement excluding coverage to any person "while in or upon, entering or alighting from the automobile". Morris was evidently attempting to comply with the motor carrier law with the least expense possible. As long as he was only hauling brick and other low grade commodities as distinguished from passengers, the risk assumed by the casualty company was not great. By inserting the endorsement excluding the passenger hazard, the company could write the policy for a little more than half the ordinary cost, and this they agreed to do. "The risk upon the insurer in covering liability for injuries to passengers is entirely different from that assumed concerning liability for injuries to freight". Hawkeye Casualty Company v. Halferty, supra [131 F.2d 299]. Insertion of M. C. Form 13 to assure that nothing in the policy limited the liability of the casualty company while the truck was engaged in the trucking business as a common carrier, fully complied with the common carrier law.

A late case directly in point is the Halferty case, cited above, in which the Supreme Court denied certiorari in February, 1943. In order to qualify certain trucks as common carriers under regulations of the Public Service Commission of Missouri, the casualty company issued its policy of insurance. The commission required an endorsement similar in effect to that required in West Virginia, which contained a provision by which the insurer agreed to pay any final judgment rendered against the assured for personal injuries or death caused by any vehicle operated pursuant to the certificate issued by the commission. (In the case at bar the word "under" is used instead of the word "pursuant"). The endorsement, by its terms, took precedence over any other provision or endorsement attached to the policy. Another endorsement, similar to the one here, excluded liability for injuries or death sustained by any person while riding in or upon the trucks covered by the policy. On the face of the policy appeared the statement that the motor vehicles insured were to be used for commercial purposes. The term "commercial" was defined as "use principally in the business occupation of the named insured as stated in item 1(e), including occasional use for personal, pleasure, family and other business purposes". One of the trucks and a driver was furnished to a neighboring farmer for hauling farm products from one place on his farm to another, requiring the occasional use of a public highway. This use of the truck was of a commercial nature, since it was under contract for hire, but the use was one which did not require a permit from the Missouri Commission. After work had been completed, the driver was returning to town where the truck was kept. Riding in the truck as guests of the driver were 18 or more of the farm laborers. An accident occurred and several of them were injured, one fatally, resulting in a number of suits. As here, the casualty company declined to defend the suits on the ground that the liability, if any, was not covered by the policy. It claimed that the exclusion clause relating to persons riding in the truck absolved it from liability. In order to settle the controversy, the casualty company, as here,

brought suit in the district court for a judgment declaring that the policy did not cover liability, if any, in the circumstances stated, and that the casualty company was not obligated to defend the suits in the state courts nor pay any judgment that might be rendered. The district court decided against the insurance company, which appealed. The Circuit Court of Appeals reversed the judgment. It held that since the truck was engaged in a use which, though commercial, did not require the consent of the commission, the endorsement required by the commission was not applicable; and that by reason of the exclusion of passenger hazard endorsement, there was no coverage. The court said: "We are of the opinion that the appellant's construction of the insurance contract is the only one permissible. It is not denied that the only jurisdiction or power in the Missouri Public Service Commission with reference to the insurance involved here concerns the operations of motor vehicles as common carriers. Parties not engaged in such an operation are not required by the laws of Missouri to carry any insurance. It follows that under Missouri law the parties to the insurance contract were at liberty, so long as not operating as common carriers, to make any contract of insurance they thought proper or to limit the coverage in any contract made as their interests might dictate. Only as to their business as common carriers were the appellees required to take and the appellants to deliver insurance conditioned as required by the Missouri law. Since the jurisdiction of the Public Service Commission over the character of insurance carried by persons operating automobiles in Missouri extended only to the operations of common carriers, it must be assumed that the Commission did not attempt to exercise any power or authority over motor vehicles not being operated as common carriers. No reason appears why a common carrier operating motor vehicles in Missouri might not, after complying with the laws of Missouri in reference to insurance, applicable to its business, carry such other and further insurance as it deemed wise, or necessary to its protection. *The endorsement of the Missouri Public Service Commission applied only to motor vehicles operated in the business of common carriers and was without application in the case of a motor vehicle not so used or operated.*"

The court considered the word "pursuant" in the Missouri endorsement synonymous to the word "under" in the West Virginia endorsement, for it said at page 299 of the opinion in 131 F.2d: "Since the truck involved in the accident under consideration was not engaged at the time of the accident as a common carrier of freight *under* the appellees' certificate of public convenience and necessity, the endorsement of the Missouri Public Service Commission, limited to such operations, has no application * * *. The situation in all respects is as if the appellees were not engaged as common carriers, and as if no such endorsement was contained in the policy."

In the case under consideration the policy stated that the purposes for which the truck was to be used were "commercial", which is defined as "use principally in the business occupation of the named insured * * * including occasional use for personal, pleasure, family and other purposes". Defendants contend that under this definition the truck was being used for a commercial purpose at the time of the accident, and that, if the use was commercial, the commission endorsement was applicable. I cannot subscribe to this conclusion. It is clear that the truck was being used for commercial purposes under the definition of the policy. This means that the truck was being used for the permissible purposes stated in the policy. It does not follow that if the use was commercial within the definition of the policy, that it was, therefore, a use under the motor carrier permit or certificate of convenience, or putting it another way—a use for which such a permit was required. Hawkeye Casualty Co. v. Halferty et al., supra.

Defendants argue that their construction of the policy is supported by the last paragraph in the endorsement by which the insured agrees to reimburse the casualty company for any payment made which it would not have been obligated to make under the provisions of the policy, except for the agreement in the endorsement. Such provision was not intended to cover the situation which we have here. It was inserted to assure the existence of coverage when the truck was being used in the business for which the permit was required, irrespective of any violation by the assured, which would otherwise defeat coverage, such as violation of statutes or provisions

of the policy with respect to age of the driver, failure to give prompt notice of the accident, failure to cooperate in investigation and many others.

It is difficult to find cases so nearly in point as the Halferty case, cited above, on account of the difference in statutes and commission regulations in the various states. While not directly in point, the opinions in the following cases, in addition to those cited, support the conclusions herein reached: Smith v. Republic Underwriters, etc., 152 Kan. 305, 103 P.2d 858; Schoonover v. Clark et al., 130 P.2d 619, 155 Kan. 835; Flythe v. Eastern Carolina Coach Co., 195 N.C. 777, 143 S.E. 865; Basta v. United States Fidelity & Guaranty Co., 107 Conn. 446, 140 A. 816. The following cases cited by defendants can be distinguished for the reason that each of them involves accidents which occurred while the vehicle was being used for the very purpose for which a permit or certificate of convenience was required: Central Mutual Ins. Co. v. Tartar, 6 Cir., 92 F.2d 839; Central Mutual Ins. Co. v. Pippen, 271 Ky. 280, 111 S.W.2d 425; Continental Casualty Co. v. Shankel, 10 Cir., 88 F.2d 819; American Fidelity & Casualty Co. v. Big Four Taxi Co., 111 W. Va. 462, 163 S.E. 40; Black & White Cab Co. v. New York Indemnity Co., 108 W. Va. 93, 150 S.E. 521; Worrell v. Worrell, 174 Va. 11, 4 S.E.2d 343. It should also be noted that the endorsement involved in the Tartar and Pippen cases is much broader than the West Virginia endorsement, and that in these cases the suit was not founded on the requirements of the Motor Vehicle Act and rules of the Public Service Commission of Ohio, but on a contract for the benefit of "any person injured or killed through the negligent operation of the truck" [92 F.2d 840]. In Travelers Mutual Casualty Co., etc., v. Thornsbury, 276 Ky. 762, 125 S.W.2d 229, the court held the limitation of coverage contained in the policy was superseded by the statutory endorsement, and that it was immaterial that the accident occurred while the cab was being used for a private purpose. In reaching its decision the court relied strongly upon the Tartar and Pippen cases which involved Ohio trucks and in which the Kentucky statute did not figure, notwithstanding the important distinction that in the Tartar and Pippen cases the vehicle was being used for a purpose for which a permit was required. An examination of these cases leads me to believe that the Tartar and Pippen cases are not authority for the holding in the Thornsbury case. It is difficult to analyze the Thornsbury case because the Kentucky statute, if considered, was not quoted. However, it seems to be in conflict with the Halferty case, and the great weight of authority. The case of Rusch v. Mielke et al., 234 Wis. 380, 291 N.W. 300, can be distinguished because of the difference in the statutes of Wisconsin and West Virginia relative to the insurance coverage of the carriers. The Wisconsin statute provides indemnity for any damages recovered against the "owner or operator of each such motor vehicle by reason of the negligent use or operation thereof". St.1939, § 194.41. There is no language indicated that the provision is to apply only when vehicles are used as motor carriers such as are contained in the West Virginia statutes.

Defendants Motter and Simon say that the "Exclusion of Passenger Hazard" endorsement was illegal. This defense was mentioned for the first time in the oral argument. Without any mention of this defense in any of the pleadings, plaintiff and defendants, Motter and Simon, have offered affidavits on this issue, without objection or claim of surprise by anyone.

■ The defense of illegality must be affirmatively pleaded. Rule 8(c), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. But failure to plead an affirmative defense is immaterial if evidence of the defense is introduced and not objected to for failure to plead it, and no surprise is claimed. Tillman v. National City Bank of New York, 2 Cir., 118 F.2d 631. This means that the question of illegality is an issue in this case and must be decided.

Illegality is claimed because it is said that Edgar B. Sims, Insurance Commissioner of West Virginia, had not given his approval to the endorsement. The insurance company contends that such endorsement was submitted to the insurance commissioner and duly approved for use in West Virginia. Permission was given all parties to submit additional evidence upon this factual question and the case was then submitted to the court for final determination upon the merits as to all questions of law and fact.

■ An examination of the evidence on this issue convinces me that prior to the inclusion of this endorsement in the policy

in question, the same was duly approved by the Insurance Commissioner of West Virginia and notice given to the insurance company by such commissioner that such endorsement was duly filed in his office for future use in West Virginia. The defense of illegality is without merit.

The evidence submitted upon this issue shows that the Insurance Commissioner of West Virginia disapproved generally of provisions in policies of casualty insurance which exclude from coverage, liability for guests in a motor vehicle, and on March 5, 1936, he issued a ruling forbidding such exclusion of coverage. On March 4, 1940, the insurance company wrote the commissioner asking his approval for the rating of all dump body trucks as commercial class 4, "such rating to exclude coverage for passengers * *". On March 7, 1940, the commissioner gave his approval by stamping upon such letter the words "Filed for use in the State of W. Va. on and after this ——— day of ———, 19—. (Signed) Edgar B. Sims March 7-1940 State Auditor Insurance Commissioner". On or about October 1, 1941, the commissioner issued "Departmental Ruling No. 4", the effect of which was to establish minimum policy requirements, and required all casualty insurance companies to submit to the commissioner for approval on or before December 31, 1941, copies of forms of all policies and endorsements to be used by such companies in West Virginia on and after January 1, 1942. Accordingly, plaintiff wrote the insurance commissioner a letter enclosing its form of policy and a number of endorsements which it proposed to use in West Virginia on and after January 1, 1942. The letter stated that such endorsement forms were submitted for his approval, and enclosed a copy of each form, as well as a list of all forms submitted, such list showing the number and name of each endorsement. At the top of the second page of the list of endorsements, this particular endorsement was listed and described as follows: "P152-Exclusion of Passenger Hazard". Thereafter the commissioner's office approved plaintiff's policy and all the endorsements except two, one of which was disapproved, and the other was returned for further procedure. As evidence of approval of the endorsement in question, the following words were stamped upon the endorsement at the office of the commissioner: "Filed for use in the State of West Virginia on and after this 2 day of Jan. 1942. (Signed) Edgar B. Sims State Auditor Insurance Commissioner". The same words were stamped on each page of the list of endorsements, but appropriate words were used to show the two endorsements which had not been approved. Except as to the two endorsements which were not approved, check marks were placed after each endorsement, including the "Exclusion of Passenger Hazard" endorsement. This would clearly indicate that each endorsement was considered separately and either approved, disapproved, or returned for further action.

"Department Supplemental to Ruling No. 4" required insurance companies submitting policy forms and endorsements for approval to certify that they comply with the minimum requirements described in Departmental Ruling No. 4, and in submitting its policy and endorsements plaintiff made such certification. If such policy and endorsement did not meet every necessary requirement, it was the duty of the commissioner to disapprove the same and notify the insurance company, so that it would not use the endorsement in West Virginia in the future. Instead, the insurance commissioner indicated his approval by stamping upon the endorsement appropriate words to show that the endorsement was filed for future use in West Virginia on and after January 2, 1942. The policy in question was issued on August 23, 1942. Plaintiff was entitled to and did rely upon these words and the subsequent action of commissioner as indicating his permission to make use of the endorsement in West Virginia after January 2, 1942. The commissioner states in his affidavit that the expression "Filed for use in West Virginia" is commonly relied upon by insurance companies as indicating permission to make use, in West Virginia, of the form so stamped.

Harlan Justice, a deputy insurance commissioner who is responsible for the approval and disapproval of all insurance policies and endorsements, under direction of the insurance commissioner, stated that the use of the "Exclusion of Passenger Hazard" endorsement in any automobile liability policy written in West Virginia is against the rules promulgated by the Insurance Commissioner of West Virginia. With reference to the specific authority given the plaintiff to use such endorse-

ment, he says that plaintiff's letter dated March 4, 1940, asking approval for the rating of all dump body trucks as commercial class 4, "such rating to exclude coverage for passengers * * *" was received, but was stamped filed for use in West Virginia "through inadvertence and mistake". The letter was brief and specifically points out that the rating excludes coverage for passengers. It is difficult to understand how it could be misunderstood. He states that it was also through inadvertence and mistake that the endorsement in question was likewise stamped filed for use in West Virginia when submitted for approval on December 30, 1941, almost two years later; and that such stamping was done in reliance upon the letter of the insurance company submitting such endorsements for approval, wherein it stated that such endorsements complied with Departmental Ruling No. 4. Again it is difficult to understand how there could be any mistake about the effect of an endorsement, the title of which was "Exclusion of Passenger Hazard". There was no evidence of fraud or intentional misrepresentation on the part of the insurance company.

Irrespective of previous rules or regulations, the commissioner could make the use of the endorsement entirely regular by specific approval. He gave that approval, and its use under such circumstances was not illegal.

A declaratory judgment may be entered for the plaintiff in accordance with the views herein expressed.